NEW-YORK, Oct. 1822.

The People *vs.* Eliza Tripler.

ted at the time of the greatest alarm and terror in that portion of the city, the seat of depredation and crime.

He confessed from what house he had stolen the articles; at what time, and to whom he had sold them. He exposed the names of his associates, who were found to be young boys from fifteen to twenty years of age ;. and who, in consequence of his confession, were arrested, tried, and convicted : and are now suffering the pain of punishment for a long term in the State's Prison.

Foxall was arrested, and part of the articles found in his coat pocket, between the bedticking and cords of the bedstead.

The articles were claimed and identified by Mr. Brett.

*Price,* his counsel, made a strenuous defence ; but the testimony being too strong to resist, he was convicted and sentenced.

## The People *vs.* Eliza Tripler.

It seems on a prosecution for felony, a specific act of derangement need not be shown : if the jury believe, from all the circumstanc's of the case, that the prisoner is insane they ought to acquit.

ELIZA TRIPLER was charged with stealing five silver spoons from the house of Mr. Stonehale. Mr. Stonehale missed the spoons, and immediately went to the silver smiths in the neighborhood, and gave them a description of the articles stolen.

The prisoner offered them for sale, and was detected, taken to the police, examined, and committed for trial. The spoons were proved to be the property of the prosecutor, and these facts were made out to the satisfaction of the court and jury.

The defence set up was, that the prisoner was at times insane : her sister testified that she had a fall some years ago " that affected her head." The prosecutor himself thought " her conduct was strange," but none of the wit-

nesses testified to any act or acts of mental derangement, or pointed out any particular manner of defence to show it

*By the Court.*—"Although the defence has not been satis- "factorily made out, yet there was quite enough made out "to raise a doubt in the mind of the court of the prisoner's "being a person of a sound mind; and where a doubt ex-"ists, it would always be the safest way to acquit: insanity "itself is calamity enough, without inflicting the pain of a "conviction and its consequences. The witnesses have not "shown any particular act whereby we could discover de-"rangement, yet it is sufficient to say that a doubt has "been raised, and that doubt ought to operate in favor of "the prisoner."

The jury returned a verdict in favor of the prisoner, without leaving the box.

NOTE.—No question that ever can come before a court and jury, is so embarrassing to consider, and with precision to determine, as cases of real or alleged insanity. What deprivation of reason ought to protect the unfortunate from punishment, and what ought not to cover them as a shield, from suffering the reward of crime, is a question of great importance, and greater difficulty.

In the language of his honor, " insanity itself is calamity enough, without inflicting the pain of a conviction." But man in this particular is short sighted: he cannot look into the secret recesses and hidden places of his neighbor's heart: he cannot discriminate and mark the nice and almost imperceptible shades of mind, between cool reason and a morbid passion. Lord Erskine, in his admirable defence of James Hadfield, says, "yet so fearfully and wonderfully are we "made; so infinitely subtle in the spiritual part of our being, so "difficult is it to trace with accuracy the effect of diseased intellect "upon human action, that I may appeal to all who hear me, whether "there are any causes more difficult, or which, indeed, so often con-"found the learning of the judges themselves, as when insanity, or "the effects and consequences of insanity, become the subject of "legal consideration and judgment."

The rules upon this subject are few and plain, but the application of them is often distressingly uncertain. Man is a reasonable creature, and therefore accountable. Deprive him of this faculty, and his accountability is at an end. He is then said to be *non compus mentus;* which, according to Lord Coke, is of four kinds, viz:

1 *Idiocy,* or a natural fool, one who has no understanding, and is never presumed will have any.

2. *Idiocy,* one made so by grief or sickness, &c.

3. *Lunacy,* a person who sometimes has an understanding, and sometimes not.

4. *Lunacy,* a person *non compus* by drunkenness, &c.

Under one of these classes, *it is agreed by most jurists, to place every legal case of insanity.* Lord Hale, however, in his 4th Institute, has divided it into *total* insanity and *partial* insanity: he says, " There is " a partial insanity of mind, and a total insanity. The former is ei- " ther in respect to things *quoad hoc vel illud insanire.* Some persons " that have a competent use of reason, in respect of some subjects, " are yet under a particular *dementia* in this respect, of some partic- " ular discourses, subjects, or applications: or else it is partial in re- " spect of degrees: and this is the condition of very many, espe- " cially melancholy persons, who for the most part discover their de- " fect in excessive fears and griefs, and yet are not wholly destitute " of the use of reason; and this partial insanity seems not to excuse " them in the committing of any offence, for its matter capital; for " doubtless most persons, that are felons of themselves and others, are " under a degree of partial insanity, when they commit these offences. " It is very difficult to define the invisible line that divides perfect " and partial insanity; but it must rest upon circumstances duly to " be weighed, and considered both by judge and jury, lest on the one " side there be a kind of inhumanity towards the defects of human " nature; or on the other side, too great an indulgence given to great " crimes."

This division of the subject into partial and total insanity is sufficiently correct, for the purpose of this note. With respect to the latter, there can be no difficulty: the unfortunate objects are too conspicuous to deceive; but partial insanity often baffles the penetration of the most persevering observer.

There is a well known distinction between the civil and criminal accountability of a person *non compus mentus.* The law avoids the acts of the first, although they cannot be traced or satisfactorily connected with a morbid imagination; but in the latter, the connection ought to be shown.

In a criminal point of view, it is not necessary that there should be a total deprivation of reason, to free a man from the responsibility of a criminal act; in the language of Lord Erskine, in the case before cited—"If it was meant to protect a man from punishment, he must "be in such a case of prostrated intellect, as not to know his name, " nor his condition, nor his relation towards them—that if a husband, "he should not know he was married; or if a father, could not re-"member that he had children; nor know the road to his house, nor "his property in it—then no such madness ever existed in the world. "It is idiocy alone which places a man in this helpless condition; "where, from an original mal-organization, there is the human frame "alone, without the human capacity."

The following conclusions from all the cases, are respectfully submitted.

The true rule seems to be, where the delusion is the effect, and founds all its deductions from matters *supposed to be real,* when in fact they have no existence out of a diseased imagination, or are so distorted by a delusive fancy, that nothing will convince of the absence of reality. Such a case will clearly entitle the party to an acquittal, upon trial for any criminal act; because it is impossible for that man to draw right conclusions, whose premises are false, or have no existence; it will then stand thus :

1. Where the mind rests upon a supposed circumstance or fact, that has no existence, there the party is not answerable for any act in a criminal point of view.

2. When reason is nearly prostrated, but some glimmering sparks of intelligence are visible, (without any reference to the *reality* or *delusion* of any circumstance the mind is supposed to be engaged upon,) there, if he has the understanding of a child of fourteen years of age he may be punished.

This description comprises persons, who upon ordinary subjects are of sound minds, but upon some particular one, are affected by the most positive and marked species of *madness.* They

NEW-YORK,
Oct. 1822.

The People
vs.
Eliza Tripler.

of course could not be answerable for any act on which the delusion rested, but are answerable for all others.

4. The act in order to bring it within the first and second case, must not only proceed from insanity, but it must proceed *immediately* and unqualifiedly from the disease.

5. Where a wicked act is done from motives of malice and evil intentions, although the mind may be so partially affected as to avoid the acts of the lunatic, in a civil case, yet he onght to be punished for his criminal acts, 'if malicious mischief, and not insanity, had impelled him.   City Hall Rec. Vol. 1. p. 6.   The King *vs.* John Tuth.   Old Bailey Sess. April 17, 1790.

When a man, through the influence of violent passions, has been hurried into a state of temporary phrensy, and under that excitement commits a crime, he never can allege insanity as an excuse.   City Hall Rec. Vol. 3, p. 125.   Pienovie's case.